<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROBERT OLESON, | : | Civ. No. 09-5706 (NLH) |
|  | : |  |
| Plaintiff, | : | <u>OPINION</u> |
|  | : |  |
| BUR. OF PRISONS, et al., | : |  |
|  | : |  |
| Defendants, | : |  |

**APPEARANCES:**

> ROBERT R. OLESON, #07729-051, Plaintiff <u>pro se</u>
> FCI Elkton
> P.O. Box 10
> Lisbon, Ohio 44432

**HILLMAN**, District Judge:

Plaintiff Robert R. Oleson, a prisoner who is presently confined at FCI Elkton, filed an Amended Complaint [Dkt. 102] against several officials at his former facility (FCI Fort Dix in New Jersey), asserting violation of his constitutional rights under <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971). Before this Court are two motions: (1) Oleson's motion "for Order To Show Cause Why Warden Zickefoose Should Not Be Held in Contempt of Court" [Dkt. 122]; and Warden Zickefoose's cross-motion for entry of an order

1

vacating the portion of the August 18, 2010, Order directing Zickefoose to "see to it that blank administrative remedy forms (BP-9, BP-10, and BP-11) are readily available to Plaintiff (and all other inmates at FCI Fort Dix) on a consistent basis." [Dkt. 28.]  However, because Oleson's Amended Complaint has not been screened for dismissal, as required by 28 U.S.C. § 1915(e)(2)(B), this Court will screen the Amended Complaint, dismiss it for failure to state a claim upon which relief may be granted, and deny the motions.

## I. BACKGROUND

On August 25, 1993, a jury in the United States District Court for the Western District of Michigan convicted Oleson of 22 counts of drug-related crimes, including conspiracy to distribute marijuana, interstate travel in aid of racketeering, and money laundering.  See Oleson v. United States, 27 Fed. App'x 566 (6th Cir. 2001).  On direct appeal, the Sixth Circuit vacated the money laundering conviction, affirmed the remaining convictions, and remanded for resentencing.  Id.  On June 15, 1995, the District Court resentenced Oleson to a 300-month term of imprisonment.  Id.  In 1996, Oleson filed a motion to vacate the sentence, which was dismissed on December 11, 1996, without prejudice after Oleson moved to withdraw it.  Id.  In December 2001, the Sixth Circuit affirmed the District Court's order

2

denying Oleson's motion to amend the § 2255 motion in which
Oleson sought to include a challenge to Oleson's conviction under
Apprendi v. New Jersey, 530 U.S. 466 (2000).  Id.

Oleson arrived at FCI Fort Dix in March 2009.  [Dkt. 102 at
4.]  He remained there until May 31, 2012, when he was
transferred to FCI Elkton.  [Dkt. 140 at 2.]  The Bureau of
Prisons ("BOP") projects that Oleson will be released on March
20, 2015.  See BOP Inmate Locator, http://www.bop.gov/iloc2/
InmateFinderServlet?Transaction=IDSearch&needingMoreList=false&ID
Type=IRN&IDNumber=07729-051&x=53&y=15 (Oct. 27, 2012).

On November 5, 2009, Oleson filed his original Complaint in
this case.  [Dkt. 1.]  He named the following officials at FCI
Fort Dix as defendants:  Mr. Spalding, Ms. Brown, Mr. Thompson,
Mr. Donahue, Mr. Silver, Mr. Heffron, Mr. Scarbourough, Mr.
Espanoza, and Mr. Castillo.  This Court summarized Oleson's
factual allegations as follows:

> Plaintiff asserts that, as a result of a stroke that
> occurred several years ago, Plaintiff has limited use
> of his legs and requires a wheelchair.  Plaintiff
> alleges that he is assigned to the "handicapped room,"
> but the area contains only one handicapped accessible
> toilet, which is not sufficient for 12 inmates assigned
> to the handicapped room.  Plaintiff further asserts
> that in July 2009, he informed the Health Services
> Administrator, a doctor on the Unit, and counselors
> Silver and Thompson, that the tires on his wheelchair
> were worn down to the rims, the frame of the wheelchair
> had cracked, and the right foot board had broken off.
> Plaintiff asked these officials to replace the
> wheelchair, but he was told that no replacement was
> available.  In addition, Plaintiff submitted BP-9
> inmate remedy requests seeking a new wheelchair and
> seeking to be relocated to building 5811.  Plaintiff

3

states the he requested relocation because the offices
of Unit Team members for inmates in building 5811 are
located on the first floor, but the offices for his own
Unit Team members are located on the second floor and,
because there is no elevator, Plaintiff has limited
access to his Unit Team.

Plaintiff states that on August 17, 2009, counselor
Thompson entered Plaintiff's living area and removed
plaintiff's shower shoes (which protect his feet from
germs), his blanket, eye glasses and legal papers.
Plaintiff asserts that, although Plaintiff submitted a
BP-9 administrative remedy request and complained to
the supervisor, these items have not been returned to
him.

Plaintiff asserts that on October 6, 2009, during a
meeting with his Unit Team, counselor Brown informed
Plaintiff that she had deleted everyone from his
visitor list, in accordance with a program statement.
Plaintiff submitted a BP-9 inmate remedy request asking
for a copy of the program statement, and Brown
responded that it was available in the library.

Plaintiff alleges that on August 24, 2009, as Plaintiff
was entering the dining hall, Lt. Scarborough informed
Plaintiff that handicapped inmates would have to wait
in line outside the dining hall until he gave the
signal, like everyone else, even if it is raining
outside.  Plaintiff believes this procedure is
dangerous because the wheelchair is metal and he fears
being struck by lightning.  Nevertheless, Plaintiff
alleges that on several occasions, officials ordered
him to wait outside in the rain prior to entering the
dining hall.

[Dkt. 7 at 1-3.]

On initial screening of Oleson's Complaint, this Court

dismissed the action for failure to exhaust administrative

remedies.  [Dkt. Nos. 7, 8.]  Oleson then filed a motion to

reconsider the dismissal and a motion for an order directing

staff at FCI Fort Dix to provide prisoners with administrative

remedy forms upon request.  [Dkt. Nos. 9, 10.]  On August 18, 2010, this Court granted the motion for reconsideration, but again dismissed the Complaint for failure to exhaust administrative remedies.  Because Oleson's allegation that officials at FCI Fort Dix had systematically denied administrative remedy forms to inmates echoed complaints of other inmates at FCI Fort Dix, and because prison regulations make the Warden responsible for the operation of the Administrative Remedy Program at the institutional level, see 28 C.F.R. § 242.11(a), this Court ordered Warden Zickefoose to "see to it that blank administrative remedy forms (BP-9, BP-10, and BP-11) are readily available to Plaintiff (and all other inmates at FCI Fort Dix) on a consistent basis."  [Dkt. 28.]

On January 6, 2011, the Third Circuit reversed this Court's Order dismissing the Complaint for failure to exhaust administrative remedies on the ground that this Court had improperly placed the burden to show exhaustion on Oleson.  See Oleson v. Bureau of Prisons, 411 Fed. App'x 446 (3d Cir. 2011).  In the meantime, on November 3, 2010, Oleson had filed a motion for an order to show cause why Warden Zickefoose should not be held in contempt for violating the Order regarding the ready availability of administrative remedy forms.[1]  [Dkt. 38.]  On

---

[1] Oleson claimed that Zickefoose should be found in contempt because his counselor Thompson "refused" Oleson's request for "administrative remedy forms" on October 25, 2010, and Unit Manager Schaaf and secretary Pelton "refused" his request for

January 13, 2011, this Court reopened the file, dismissed the BOP as defendant, denied the contempt motion without prejudice on the ground that Zickefoose had not yet been served, and directed service of the Complaint on the remaining defendants.  [Dkt. 43.]

Without leave of Court, Oleson filed amended or supplemental pleadings.  On February 10, 2011, he filed a motion for leave to supplement the Complaint.  [Dkt. Nos. 46, 48, 50.]  On September 15, 2011, Magistrate Judge Schneider denied Oleson's motion for leave to file the supplemental pleadings he had submitted, but ordered Oleson to "file a single consolidated 'Amended Complaint' identifying all defendants he is suing and all claims he is asserting.  This 'Amended Complaint' shall supersede plaintiff's previous complaints, amendments and supplements.  The Amended Complaint shall be consistent with all previous orders entered in this case."  [Dkt. 89 at 4.]  Judge Schneider reasoned that, while Oleson had attempted to amend or supplement his Complaint by filing additional pleadings, these pleadings were deficient, since "it is not entirely clear who plaintiff proposes to sue and the claims he is pursuing."  Id. at 3.

On March 7, 2012, Oleson filed the contempt motion at issue.  Defendants did not file any opposition to Oleson's motion.  Rather, Warden Zickefoose filed a cross-motion for an order vacating the Order requiring staff at FCI Fort Dix to provide

---

"administrative remedy forms" on October 27, 2010.  [Dkt. 38 at 2.]

prisoners with administrative remedy forms upon request.  [Dkt. 130.]  As support, Defendant Zickefoose filed declarations from three staff members at FCI Fort Dix, and a statement in lieu of a brief.

## II.  SCREENING OF AMENDED COMPLAINT FOR DISMISSAL

Where, as here, plaintiff is proceeding in forma pauperis, federal law requires a district court to dismiss a claim "at any time" if the court determines that it "fails to state a claim on which relief may be granted."  28 U.S.C. § 1915(e)(2)(B)(ii).  This Court will screen Oleson's Amended Complaint to determine whether it fails to state a claim on which relief may be granted under Bivens.

The Amended Complaint names 15 officials at FCI Fort Dix as defendants.  [Dkt. 102.]  First, however, contrary to Judge Schneider's Order and the requirements of Rule 10(a), the title of the Amended Complaint does not name all the parties.  See Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties").  Instead, the "Table of Contents" lists 15 surnames, which this Court presumes to be the named defendants:  Spalding, Brown, Thompson, Donahue, Silver, Heffron, Scarbourough, Castillo, Espanoza, Santos, Porcarro, Zickefoose, Eichel, Palmisano, and Adamiec.  Second, contrary to Rule 10(b), the Amended Complaint is a 23-page rambling narrative without

numbered paragraphs.  See Fed. R. Civ. P. 10(b) ("A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances").  Third, contrary to Rule 8, the allegations in the Amended Complaint are not "simple, concise, and direct," and the Amended Complaint does not "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2), 8(d)(1).

The Supreme Court clarified the dismissal standard under Rule 12(b)(6) in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " Iqbal, 556 U.S. at 678 (citation omitted).

Oleson organized his narrative in the Amended Complaint according to what he believes to be the unconstitutional conduct of each defendant.  This Court will review the allegations concerning each defendant and determine if Oleson asserts a federal claim against that defendant under the Iqbal pleading standard and the legal standard for the relevant claim.

A.  Spalding - Transfer Request and Wheelchair Request

     Oleson asserts in the Amended Complaint that Spalding, the
Health Services Administrator, was "deliberate[ly] indifferen[t]
to [Oleson's] medical needs," in violation of the Eighth
Amendment by:  (1) not responding to Oleson's inmate request form
dated August 5, 2009, seeking "a transfer to FMC in Lexington
Kentucky so that I could receive rehab and enroll in the Dental
Lab Technician program so that I could be gainfully employed with
a 'sit down' job (in case the rehab doesn't work out too well)
when I get out of prison;" and (2) verbally responding to
Oleson's request for a "serviceable wheelchair" on August 5,
2009, by stating, 'Why don't you try walking!'" [Dkt. 102 at 3.]

     The Eighth Amendment's prohibition against cruel and unusual
punishment obligates prison authorities to provide medical care
to inmates.  See Estelle v. Gamble, 429 U.S. 97, 103 (1976);
Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  To state a
claim under the Eighth Amendment, an inmate must satisfy an
objective element and a subjective element.  See Farmer v.
Brennan, 511 U.S. 825, 834 (1994).  To state a cognizable medical
claim, inmates must "demonstrate (1) that the defendants were
deliberately indifferent to their medical needs and (2) that
those needs were serious."  Rouse, 182 F.3d at 197.  A medical
need is serious where it "has been diagnosed by a physician as
requiring treatment or is . . . so obvious that a lay person

9

would easily recognize the necessity for a doctor's attention." Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).  To establish deliberate indifference, a plaintiff must show that the defendant was subjectively aware of the unmet serious medical need and failed to respond reasonably to that need.  See Farmer, 511 U.S. at 837; Natale, 318 F.3d at 582; see also Erickson v. Pardus, 551 U.S. 89, 90 (2007) (Deliberate indifference includes "indifference ... manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed") (quoting Estelle, 429 U.S. at 105) (footnotes and internal quotation marks omitted).  Although "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment, Estelle, 429 U.S. at 106, deliberate indifference has been found "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  Rouse, 182 F.3d at 197.

Here, Oleson appears to claim that Spalding was deliberately indifferent to Oleson's serious medical need for a transfer to

10

FMC in Lexington so Oleson could receive unspecified rehabilitation and enroll in a training program to become a dental lab technician.  However, Oleson's desire to become a dental lab technician is not a serious medical need under Lanzaro, and Oleson does not set forth facts showing that he has an unmet medical need for rehabilitation provided at this facility and not available at FCI Fort Dix.

Oleson further alleges that Spalding's remark, "Why don't you try walking," allegedly made in response to Oleson's request for a new or different wheelchair, inflicted cruel and unusual punishment because it showed that Spalding was deliberately indifferent to Oleson's need for a new wheelchair.  But the allegation that Spalding made such a remark does not state an Eighth Amendment claim because Oleson's allegations do not satisfy the objective component, that is, Oleson had an unmet medical need for a different wheelchair.  Nor does the mere suggestion to Oleson to attempt walking show deliberate indifference under Iqbal's plausibility standard, as such a remark is consistent with the possibility that walking would serve a rehabilitative function for Oleson.  Based on the foregoing, this Court will dismiss the Bivens claims against Spalding for failure to state a claim.

B.  Brown - Deletion of Names from Visiting List

     Oleson asserts that Case Manager Brown violated his First

Amendment rights by "delet[ing] all of my family and friends from

my visiting list" [Dkt. 102 at 3], "in retaliation of me filing

Administrative Remedies in an attempt to obtain a serviceable

wheelchair from the medical department and for filing complaints

about all of the violations of Title 28 of the Code of Federal

Regulations here at FCI Fort Dix."  Id. at 4.  Oleson further

alleges:

> When I asked Brown why she did such a thing, she said
> it was BOP policy.  On or about October 15, 2009, I
> sent her an Inmate Request asking her for a copy of the
> program statement giving her the authority to delete my
> visiting list in its entirety . . . which was never
> answered by Brown.

[Dkt. 102 at 4.][2]

     "Retaliating against a prisoner for the exercise of his

constitutional rights is unconstitutional."  Bistrian v. Levi, __

F.3d ____, 2012 WL 4335958 at *19 (3d Cir. Sept. 24, 2012).

"Official reprisal for protected speech 'offends the Constitution

[because] it threatens to inhibit exercise of the protected

---

[2] In the original Complaint, Oleson states that Brown told him he
could find the program statement in the library.  Program
Statement 5267.08 governs visitation and provides, inter alia,
that an inmate's list is limited to 10 persons, persons who are
not members of the inmate's immediate family must undergo a
background check prior to placement on the list, visiting
privileges may be denied where the background information
indicates a security concern, and an inmate's visitor list may be
amended at any time.  See BOP Program Statement 5267.08,
www.bop.gov/policy/progstat/5267_008.pdf (dated May 11, 2006).

right.'" Hartman v. Moore, 547 U.S. 250, 256 (2006) (quoting

Crawford-El v. Britton, 523 U.S. 574, 588 n.10 (1998)).  A

prisoner alleging retaliation must show (1) constitutionally

protected conduct, (2) an adverse action by prison officials

sufficient to deter a person of ordinary firmness from exercising

his First Amendment rights, and (3) a causal link between the

protected conduct and the adverse action taken.  See Mitchell v.

Horn, 318 F.3d 523, 530 (3d Cir. 2003).

Whether the allegedly adverse action was "'sufficient to

deter a person of ordinary firmness from exercising his

constitutional rights' is an objective inquiry and ultimately a

question of fact." Bistrian, 2012 WL 4335958 at *19 (quoting

Rauser, 241 F.3d at 333).  To establish a causal link, the

prisoner must show that the "constitutionally protected conduct

was a 'substantial or motivating factor'" in the decision to take

adverse action.[3] Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir.

2001) (quoting Mount Healthy City School Dist. B. of Ed. v.

Doyle, 429 U.S. 274, 287 (1977)).

---

[3] However, "once a prisoner has demonstrated that his exercise of
a constitutional right was a substantial or motivating factor in
the challenged decision, the prison officials may still prevail
by proving that they would have made the same decision absent the
protected conduct for reasons reasonably related to legitimate
penological interest." Rauser, 241 F.3d at 334 see also Carter
v. McGrady, 292 F.3d 152, 154 (3d Cir. 2002) (retaliation claim
fails where prison officials would have disciplined inmate for
policy violations notwithstanding his protected activity).

Oleson's allegations satisfy the first element, as he alleges that he engaged in conduct protected by the First Amendment, i.e., he submitted administrative remedy requests in an attempt to obtain a new wheelchair and to compel officials to comply with BOP regulations.  Oleson's allegations do not satisfy the second element, as the alleged deletion of visitors from his visiting list was not objectively sufficient to deter Oleson from filing and vigorously litigating this lawsuit and submitting numerous "copouts," and nothing in the Amended Complaint suggests that Oleson was a prisoner of greater than ordinary firmness. Nor does Oleson assert any facts to support causation.  He states that Brown deleted the persons from his visitor list because he submitted administrative remedies, but provides no facts showing causation.  Moreover, Oleson asserts that, when asked, Brown said she deleted the names in accordance with the BOP's program statement.  Accordingly, Oleson's Amended Complaint supports the inference that Brown did not have a retaliatory motive.  Because Oleson makes no non-conclusory allegations refuting Brown's stated reason for deleting the names, and he fails to assert facts showing objectively adverse action, the Amended Complaint does not state a First Amendment retaliation claim against Brown.

C.  Brown and Zickefoose:  Inaccurate Information in Central File

Oleson asserts that shortly after his arrival at FCI Fort
Dix, Ms. Brown told him that his Central File indicated that
there was a warrant for his arrest from the country of Mexico.
After Oleson asked for and obtained a copy of his
Security/Designation Data form, on December 31, 2009, he
allegedly "sent Unit Manager Schaaf an Inmate Request asking that
the 'typo' on his S/D Data form be corrected, as it states that
Plaintiff has a warrant for his arrest from the Country of
Mexico." [Dkt. 102 at 5.]  He asserts that, after sending four
inmate requests seeking correction of this document to Silver and
Brown, on April 5, 2010, he submitted a BP-9 to Zickefoose.  He
alleges that Zickefoose responded on April 23, 2010, that his
"Security/Designation Data form . . . cannot be amended because
it provides information that was accurate at the time of [his]
initial designation," even though the information was not
accurate due to a typographical error.  Id. at 6.  He further
asserts that on May 18, 2010, Zickefoose issued a memorandum
stating that the warrant from the State of New Mexico had been
dropped, but she said nothing about "the fact that Plaintiff does
not have a warrant for his arrest in the Country of Mexico."  Id.
He alleges that he appealed Zickefoose's decision to the
Northeast Regional Director, who acknowledged that "'the
jurisdiction where the charge was incurred appears to be in

15

error,'" and informed Oleson that a memorandum "'has been placed in [Plaintiff's] central file to address this discrepancy.'"   Id. at 7.  Oleson alleges that he appealed to the Central Office of the BOP, but received no response.   Id.

Oleson contends that officials violated the BOP's Program Statement 5800.11, entitled Inmate Challenge to Information, which (according to Oleson) provides that "'Unit team staff shall take reasonable steps to ensure the accuracy of challenged information [in the inmate's Central file, and if] the challenged information . . . is not accurate, staff shall . . . file [the correction] in the applicable section of the Inmate Central file . . . to ensure that future decisions affecting the inmate are not based on the discredited information.'"  [Dkt. 102 at 8.]

Oleson maintains that "[t]he continued vindictive harassment by the defendants, coupled with their refusal to do their job has induced feelings of insecurity, discouragement, anxiety attacks and worry by Plaintiff wondering if he will be forbidden from going to a halfway house because of a typographical error showing a warrant for him that should have been corrected when it was brought to the attention of the defendants months ago, if not physically, then by informing the appropriate USPO in writing and requesting that a written response also be provided and put in Plaintiff's file." Id. at 8-9.  Oleson contends that this

16

"harassment" inflicted cruel and unusual punishment and was done to retaliate for his administrative remedies.

Oleson's First Amendment retaliation claim based on the difficulty he experienced in having his central record corrected fails for two reasons. Oleson did not suffer any adverse action as a result of the existence of the allegedly inaccurate information in his file (which was ultimately corrected), and his allegations do not support an inference of causation.

Oleson also argues that the existence of this inaccurate information and the failure to quickly correct it inflicted cruel and unusual punishment. To state an Eighth Amendment conditions of confinement claim, an inmate must allege facts plausibly showing (1) objectively, his conditions were so severe that they deprived him of an identifiable, basic human need, such as food, clothing, shelter, sleep, recreation, medical care, and reasonable safety, see Farmer v. Brennan, 511 U.S. 825, 834 (1994); Helling v. McKinney, 509 U.S. 25, 32 (1993); Wilson v. Seiter, 501 U.S. 294, 305 (1991), and (2) defendant was deliberately indifferent to the risk of harm to the plaintiff's health or safety. See Farmer, 511 U.S. at 837. Oleson's Eighth Amendment claim fails because the alleged existence of an arrest warrant from Mexico in his central file did not deprive him of a basic human need. Nor did defendants disregard his complaint or respond unreasonably.

17

To the extent that Oleson maintains that the alleged failure to comply with the BOP policy statement violated his constitutional rights, this claim also fails.  See Hewitt v. Helms, 459 U.S. 460, 469 (1983) ("we have never held that statutes and regulations governing daily operation of a prison system conferred any liberty interest in and of themselves"); Olim v. Wakinekona, 461 U.S. 238, 250-251 (1983) ("Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. . . .  The [government] may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the [government] does not create an independent substantive right").

Finally, an inmate has no independent constitutional right to avoid the existence of inaccurate information in his records. See, e.g., Williams v. Fed. Bureau of Prisons, 85 Fed. App'x. 299, 304 (3d Cir. 2004) (Absent a protected liberty interest, due process does not afford a prisoner any right to have inaccurate information expunged from his prison file); Hili v. Sciarrotta, 140 F.3d 210, 216 (2nd Cir. 1998) (rejecting inmate's request for an injunction to correct inaccurate information in a presentence report, which the inmate alleged was being used to deny him parole); Hampton v. Mouser, 701 F.2d 766 (8th Cir. 1983) (claim

that presence of false statements in presentence report adversely
affected parole failed to state constitutional violation).


D.  Thompson - Shower Shoes, Eyeglasses, and Legal Papers

     Oleson claims that defendant Thompson violated his
constitutional rights by the following conduct:

> On or about August 17, 2009, Defendant Thompson came
> into my room and took my shower shoes, eyeglasses, some
> legal papers that were laying on my bed and my blanket.
> (See Plaintiff's Exhibit #22)  I suffered for over a
> year without the right glasses because of him.  I had
> to squint through old scratched up glasses that gave me
> tremendous headaches.  I didn't get my new eyeglasses
> until the first of September in 2010.  He stole my
> eyeglasses and that is deliberate indifference to my
> medical condition(s)/needs and a violation of my Eighth
> Amendment [right] Against cruel and unusual punishment
> . . .
>
> And then there is the fact that Thompson took my legal
> papers.  Some of those documents were going to be
> exhibits in this case . . .  Is this not a violation of
> my Fourth Amendment Right?
>
> Thompson stole my shower shoes as well, leaving me with
> the possibility of being exposed to just about every
> type of germ, fungi and God knows whatever else happens
> to be lurking in the communal shower stalls.

[Dkt. 102 at 9-10.]

     Oleson's Fourth Amendment claim based on the seizure of his
property fails because "the Fourth Amendment proscription against
unreasonable searches does not apply within the confines of the
prison cell."  Hudson v. Palmer, 468 U.S. 517, 526 (1984); accord
Crosby v. Piazza, 465 Fed. App'x 168, 172 (3d Cir. 2012).  His
deprivation of property claim under the Due Process Clause of the

Fourteenth Amendment fails because deprivation of inmate property by prison officials does not give rise to a due process claim if the prisoner has an adequate post-deprivation remedy, see Hudson, 468 U.S. at 533, and the Administrative Remedy Program and Federal Tort Claims Act provided adequate post-deprivation remedies for Oleson.  See Bowens v. U.S. Dept. of Justice, 415 Fed. App'x 340, 343 (3d Cir. 2011); Wilson v. U.S., 29 Fed. App'x 495, 496 (10th Cir. 2002).

Oleson's claim that Thompson's taking of Oleson's eyeglasses and shower shoes violated the Eighth Amendment similarly fails. The removal of Oleson's eyeglasses and shower shoes from his cell did not deprive Oleson of a basic human need to health, or prevent him from receiving medical care, particularly since Oleson was able to use his old glasses and he subsequently received new eyeglasses.  Moreover, Oleson's allegations do not show that Thompson knew that Oleson had medical needs for eyeglasses and shower shoes, and yet he deliberately disregarded these known needs by removing these items.

Finally, the alleged removal of Oleson's legal papers did not violate Oleson's First Amendment right of access to courts. To state a cognizable access to courts claim, a prisoner must assert facts showing that he has suffered an actual injury to his ability to present a non-frivolous legal claim relating to either a direct or collateral challenge to his sentence or the

conditions of his confinement, and also showing that he has no other remedy to potentially compensate him for this lost claim. See Christopher v. Harbury, 536 U.S. 403, 415 (2002); Lewis v. Casey, 518 U.S. 343, 350, 355 (1996).  Oleson asserts that Thompson took documents that were going to be used as exhibits in this case, but he does not identify what these documents were or assert facts showing that the absence of these documents was (or would be) fatal to this or any non-frivolous case.[1]  Accordingly, the Amended Complaint does not state an access to courts claim. See Henry v. Moore, 2012 WL 4513965 (3d Cir. Oct. 3, 2012); Aruanno v. Main, 467 Fed. App'x 134, 136-37 (3d Cir. 2012); Monroe v. Beard, 536 F.3d 198, 205-06 (3d Cir. 2008).


E.  Donahue - Transfer to Another Unit

     Oleson asserts that Donahue, the Case Manager Coordinator, violated his constitutional rights by failing to return Oleson's property after Oleson told Donahue that Thompson had taken his belongings, and failing to transfer Oleson to building 5811 where the Unit Team officers are on the first floor.  [Dkt. 102 at 11] ("Donahue's failure to act on my request to have my property returned to me and my request to be moved to building 5811, not to mention the fact that he turned and walked away from me when I

_____

[1] This Court is not dismissing any claim in Oleson's Amended Complaint on account of the failure to include or attach (missing) documents.

was speaking to him about the theft of my property shows his
deliberate indifference to my medical condition(s)/needs").

The claims against Donahue based on the deprivation of
property fail for the same reasons as those claims fail against
Thompson.  The Eighth Amendment medical claim against Donahue
fails because Oleson has not asserted (and cannot assert) facts
showing that Oleson has a serious medical need to have his Unit
Team on the first floor.  The Eighth Amendment conditions claim
fails because the failure to move Oleson to a building where his
Unit Team would be on the first floor did not deprive Oleson of a
basic human need.

Oleson also contends that the failure to move him to a
building with offices for unit team members on the first floor
violated the Americans with Disabilities Act.  To establish a
violation of Title II of the Americans With Disabilities Act, an
inmate must allege that: (1) he is a qualified individual with a
disability; (2) he was either excluded from participation in or
denied the benefits of some public entity's services, programs,
or activities; and (3) such exclusion, denial of benefits, or
discrimination was by reason of his disability.  See 42 U.S.C. §
12132 ("[N]o qualified individual with a disability shall, by
reason of such disability, be excluded from participation in or
be denied the benefits of the services, programs, or activities

22

of a public entity, or be subjected to discrimination by any such entity").

Oleson's ADA claim fails because he does not assert facts showing that he was "excluded from participation in or [] denied the benefits of the services, programs, or activities" at FCI Fort Dix due to the fact that the offices of members of his unit team were on the second floor.  See Mutschler v. SCI Albion CHCA Health Care, 445 Fed. App'x 617, 621 (3d Cir. 2011) (ADA claim was properly dismissed where inmate with a disability "failed to allege any facts that demonstrate[d] that the alleged improper medical care he received was because of his disability"); Lopez v. Beard, 333 Fed. App'x 685 687 (3d Cir. 2009) ("What Lopez has alleged in his complaint and amended complaints are theories and conclusions, not facts.  While Lopez claims that he has been subject to 'prejudice, discrimination and retaliation' at the hands of certain defendants, and that Officer Alvarez made 'belittling and discriminating remarks and gestures about plaintiff [in violation of the ADA], he does not offer any specifics about these alleged incidents which would permit a court to reach the conclusion that they were discriminatory").


F.  Silver - Numerous Claims

Oleson asserts that his counselor Silver violated his constitutional rights as follows:  (1) Silver did not see to it

23

that the medical department provided a new wheelchair after
Oleson asked Silver on July 20, 2009 to contact the medical
department; (2) Silver did not give Oleson a BP-8 when Oleson
requested one in February 2010; (3) Silver told Oleson "that he
would not accept anymore 'Inmate Request' forms from [Oleson]
that [were] delivered to him by other prisoners" [Dkt. 102 at
12]; (4) Silver "failed to do his job" on August 30, 2010, when
Oleson "gave him an Inmate Request asking for help in getting
transferred to FMC Lexington so [Oleson] could get some rehab and
some vocational training," id.; (5) Silver asked an inmate who
was a member of a motorcycle club to get Oleson "to stop filing
complaints [or] Silver would see to it that the prisoner and his
'friends' would have their lockers shook down," id. at 13; and
(6) contrary to BOP policy, Silver gave the name and address of
Oleson's friend, which were on a post-it note, to an inmate to
intimidate Oleson, Oleson notified this Court of this conduct,
and Silver told Oleson that Oleson had gotten Silver in trouble
by filing the post-it in court.  Oleson concludes:  "I don't know
what can be done to get Silver to stop telling 'club'
members/prisoners what's going on with my Civil Action.  So I ask
the Court is there some type of 'gag' order you can put on him,
and get me transferred to another facility . . . .  I'm sure the
Court is well aware that the reason why such retaliatory actions

offend[] the Constitution is that [they] threaten[] to inhibit exercise of the protected Right."  [Dkt. 102 at 14.]

The problem with Oleson's claims against Silver is that none of the alleged conduct of Silver violated Oleson's constitutional rights.  Oleson complains that Silver did not get him a new wheelchair, but Oleson does not show that he had a serious medical need for a new wheelchair or, even if he did, that his counselor was responsible for obtaining a wheelchair from the medical department.  Oleson asserts that Silver did not provide a requested BP-8 form on one occasion, and told Oleson that Silver would not accept Oleson's requests submitted by another inmate, but Oleson does not assert facts showing that he was harmed by or suffered adverse action as a result of this conduct.  Oleson asserts that Silver failed to effectuate Oleson's transfer to another facility, but Oleson was in fact transferred to another facility.  In any event, an inmate has no constitutional right to be transferred to the facility of his choice.  See Meachum v. Fano, 427 U.S. 215, 224-25 (1976) ("The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause . . . .  That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules"); see also Olim v. Wakinekona, 461 U.S.

25

238, 245 (1983) ("Just as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State"); Ball v. Beard, 396 Fed. App'x 826 (3d Cir. 2010) (same); Gibson v. Lynch, 652 F.2d 348, 354 (3d Cir. 1981).

Finally, Oleson asserts that Silver told other inmates who were motorcycle club members about Silver's case, suggested that these unnamed inmates could get Oleson to stop complaining, and provided a post-it note with the name and address of Oleson's friend to an inmate. This Court construes these allegations as an attempt to state an Eighth Amendment failure to protect claim.

To state a failure to protect claim, an inmate must assert facts showing: (1) he is objectively "incarcerated under conditions posing a substantial risk of serious harm;" (2) defendant subjectively "knows of and disregards an excessive risk to inmate health or safety;" and (3) causation. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Oleson's Amended Complaint fails to state a failure to protect claim against Silver because Oleson's allegations do not show that he faced a substantial risk of serious harm. Nor does he assert facts showing that Silver (or another defendant) knew of and disregarded an excessive risk

to his safety.[4]   Accordingly, the Amended Complaint fails to state a failure to protect or other constitutional claim against Silver.

## G.   Heffron - Failed to Respond to Request for Wheelchair

Oleson asserts that on August 17, and 19, 2009, he sent administrative remedy requests to Acting Warden Heffron "asking [for] his help in getting me a wheelchair that worked" and having Thompson return Oleson's belongings.   These claims fail for the reasons the same claims against other defendants fail.

## H.   Waiting in Dining Line During Rain

Oleson asserts that on August 24, 2009, August 26, 2009, October 19, 2009, July 10, 2010, and October 14, 2010, Scarbourough, Castillo Espanoza, Santos, and Porcarro, separately required him (and other wheelchair-bound prisoners) to "go back to the end of the walkway to the dining hall and wait in my metal wheelchair in the middle of a rainstorm, under a tree, in a 'lake' of water and wait for the signal [to enter the dining hall].   [Dkt. 102 at 16.]   Oleson states that he suffers "mental anguish and anxiety attacks" when he is ordered "under threat of going to the 'hole' for disobeying a direct ORDER, to sit in a

---

[4] Oleson mentions the phrase "retaliatory actions," but he does not state a First Amendment retaliation claim against Silver because he does not show adverse action or causation.

27

metal wheelchair in the middle of a rainstorm, in a 'lake' of water, under a tree, and wait for the signal, or a lightning strike!" Id. at 15.  He further alleges that Warden Zickefoose "allows this practice to continue unabated," and exacerbated the problem by having the road resurfaced in front of the dining hall, such that a large puddle forms at the approach to the dining hall when it rains hard enough.

To state a failure to protect claim, an inmate must assert facts showing:  (1) he is objectively "incarcerated under conditions posing a substantial risk of serious harm;" (2) defendant subjectively "knows of and disregards an excessive risk to inmate health or safety;" and (3) causation.  Farmer, 511 U.S. at 837.  Oleson's failure to protect claim fails because he has not alleged facts showing that he was incarcerated under conditions posing a substantial risk of being struck by lightning.[5]  Nor does he assert facts showing that defendants were aware that, by requiring Oleson to wait in line (for an unspecified time period) during the rain prior to entering the dining hall, Oleson faced a substantial risk of being struck by lightning.

--------

[5] While not basing its determination on this statistic, this Court notes that, according to the National Weather Service, an average of 360 persons per year (out of a total population of 310,000,000) are struck by lightning in the United States, such that the odds of being struck by lightning in a given year is one out of 1,000,000.  See National Weather Service, Lightning Safety, www.lightningsafety.noaa.gov/medical.htm (Oct. 28, 2012).

I.   Zickefoose - Failure to Provide Paid Inmate Companion

Oleson asserts:

> [I]t is over three quarters of a mile, up hill, to the
> commissary from some housing units.  It is impossible
> for the wheelchair bound to get through the snow to
> commissary at times.  In fact there are some of us who
> can't get around at all without assistance, Plaintiff
> included.  It is impossible to get to medical for our
> medication at times as it is well over a half mile to
> medical from some housing units.  It is impossible to
> get to the chow hall at times during inclement weather,
> including when it rains for fear of being hit by
> lightning, or having to sit out in the rain.

> The aforementioned 'lakes' of water freeze in the
> winter and Plaintiff has seen a number of prisoners
> slip and fall and the CO's just stand there and laugh
> about it, and getting up the ramp in front of the
> education building is a challenge because of the water
> freezing on the ramp in the winter.

[Dkt. 102 at 19.]

Oleson maintains that the failure of FCI Fort Dix to provide

paid "inmate companions" to assist inmates in wheelchairs

violates the ADA and Title 28 of the Code of Federal Regulations,

which, according to Oleson, "states that if a prisoner cannot

perform a major life activity, such as walking, [he] shall be

provided with assistance." [Dkt. 102 at 18.]  Oleson concludes

that "[t]his facility, of all facilities, should have what is

referred to as 'inmate companions' to assist them." [Dkt. 102 at

18-19.]

This Court has reviewed Title 28 of the Code of Federal

Regulations, which includes the following provision:  "[N]o

29

qualified handicapped person shall, because the agency's
facilities are inaccessible to or unusable by handicapped
persons, be denied the benefits of, be excluded from
participation in, or otherwise be subjected to discrimination
under any program or activity conducted by the [Department of
Justice]." 28 C.F.R. § 39.149. Oleson does not assert, however,
that he was denied the benefits of, excluded from participation
in, or otherwise be subjected to discrimination under any
specific program or activity because of his disability. For
example, while he may want the prison to designate an "inmate
companion" to push his wheelchair, he does not assert that he was
unable to obtain assistance, when needed, to get to the dining
hall, the medical unit, his housing unit. Thus, he has not
asserted a claim under the ADA.

J.  Eichel

Oleson asserts that on two occasions, Eichel falsely told
Oleson that the medical unit had a new wheelchair for Oleson.
"On these two occasions when Eichel told Plaintiff that he had a
new wheelchair for Plaintiff, Plaintiff was elated knowing that
he was going to get a new wheelchair and he wouldn't have to
worry about getting hurt or killed in the rickety old wheelchairs
that he had been using . . . . When Eichel told Plaintiff that
he didn't have a new wheelchair for Plaintiff, Plaintiff was

30

devastated.  The mental anguish that his cruel jokes caused Plaintiff is indescribable" and inflicted cruel and unusual punishment.  [Dkt. 102 at 20-21.)

The problem with the claim against Eichel is that verbal threats or taunts, without more, are not sufficient to constitute cruel and unusual punishment.  See Dunbar v. Barone, 2012 WL 2775024 (3d Cir. July 10, 2012); McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001); DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000).


K.  Palmisano & Adamiec

Oleson asserts that he would like to add Ms. Palmisano, who works in the medical records department, and his case manager, Mr. Adamiec, "to the defendants list," pending receipt of further information.  [Dkt. 102 at 21.]  As Oleson asserts no facts plausibly showing that these defendants violated his constitutional rights, they are not properly named as defendants and must be dismissed from the action.


L.  Amended Complaint

As he may be able to cure the defects in certain claims by alleging additional facts, this Court will grant Oleson leave to file an amended complaint which states a cognizable claim for (1) deliberate indifference to serious medical need for new

wheelchair or new eyeglasses, contrary to the Eighth Amendment, and (2) under the ADA.  See DelRio-Mocci v. Connolly Properties Inc., 672 F.3d 241, 251 (3d Cir. 2012); Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).  If Plaintiff elects to file an amended complaint, this Court suggests that he fill in all the blanks on a civil rights complaint form, list each defendant in the caption and body, and set forth in numbered paragraphs in the body of the complaint facts clearly and concisely stating what each defendant did to violate his Eighth Amendment and/or ADA rights.  Also the amended complaint must be complete on its face, without reference to prior pleadings.[6]

### III. MOTIONS

Oleson filed a motion "for Order To Show Cause Why Warden Zickefoose Should Not Be Held in Contempt of Court." [Dkt. 122.] This motion, like his prior contempt motion, is founded on the "refusal" of counselor Thompson to provide unspecified "administrative remedy forms" on October 25, 2010, and the "refusal" of Unit Manager Schaaf and secretary Pelton to provide

---

[6] Once an amended complaint is filed, previous dismissed complaints no longer perform any function in the case and cannot generally be utilized to cure defects in the current amended complaint.  See 6 Wright, Miller & Kane, Federal Practice and Procedure:  Civil 2d § 1476 (1990).  Thus, if Plaintiff elects to file an amended complaint, he should name the defendants and on the face of the amended complaint and state facts amounting to a claim against each named defendant in numbered paragraphs, and comply with Rules 8 and 10.

unspecified "administrative remedy forms" on October 27, 2010.

Oleson also asserts:

> When a prisoner is able to obtain a BP-8 form, the
> staff refuse to respond to it or claim they never
> received one, and they refuse to sign the prisoner's
> copy as a receipt.  Unit Team staff have an 'in house'
> rule that one has to show staff his previous complaint
> form before he is allowed to obtain another one from
> staff.  There is nothing in the C.F.R. or B.O.P.
> Statement stating that one is required to show staff
> anything.  28 C.F.R. 542.14(c)(1) states:  "The inmate
> shall obtain appropriate forms from institutional
> staff."  On occasion a staff member will take one's BP-
> 8 when it is shown to him and he will keep it stating
> that he will return it later with the BP-9 that was
> requested, but they never return with the BP-8 or the
> BP-9.  When questioned, they state that they never
> remember receiving any BP-8 from anyone.  If one
> attempts to start all over again, he is 'time barred'
> for filing his complaint too late.

[Dkt. 122 at 2-3.]

Without filing opposition to the contempt motion, Warden
Zickefoose filed a cross-motion for an order vacating that
portion of the August 18, 2010, Order which directs Zickefoose to
"see to it that blank administrative remedy forms (BP-9, BP-10,
and BP-11) are readily available to Plaintiff (and all other
inmates at FCI Fort Dix) on a consistent basis."  [Dkt. 28.]  In
her supporting statement in lieu of brief, Zickefoose argues that
the Order should be vacated because Oleson has not requested any
administrative remedy forms since entry of the Order, Oleson was
able to and did submit numerous "copouts," "[t]he declarations
from members of Plaintiff's Unit Team [filed with the motion]
clearly demonstrate that administrative remedy forms have always

33

been available to Plaintiff," and, "[u]nless vacated, the Warden will continue to be subject to motions for contempt that have no factual basis whatsoever." [Dkt. 130-1 at7, 10.]

Civil contempt sanctions are designed to coerce or compensate. See Berne Corp. v. Government of the Virgin Islands, 570 F.3d 130, 139 (3d Cir. 2009). "A plaintiff must prove three elements by clear and convincing evidence to establish that a party is liable for civil contempt: (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." Roe v. Operation Rescue, 54 F.3d 133, 137 (3d Cir. 1995 (citation and internal quotation marks omitted); see also Marshak v. Treadwell, 595 F.3d 478, 485 (3d Cir. 2009). Here, there is no dispute that an order existed and that Warden Zickefoose had knowledge of the Order. The question is whether Oleson has shown by clear and convincing evidence that Zickefoose disobeyed the Order.

The elements of civil contempt must be proven by "clear and convincing" evidence, and "ambiguities must be resolved in favor of the party charged with contempt." John T. v. Delaware County Intermediate Unit, 318 F.3d 545, 552 (3d Cir. 2003). Evidence is "clear and convincing" when it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come

34

to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Jones v. Brown, 425 Fed. App'x 93, 96 (3d Cir. 2011) (citation omitted).

Oleson provided no evidence, clear and convincing or otherwise, that Zickefoose disobeyed the Order. Rather, he asserts that on two occasions, Oleson asked counselor Thompson (on October 25, 2010) and Unit Manager Schaaf and secretary Pelton (on October 27, 2010), for unspecified "administrative remedy forms," but Thompson, Schaaf and Pelton did not give him forms. [Dkt. 122 at 2.] Oleson does not indicate which form he needed or provide any further details. This Court cannot come to a clear conviction on the basis of this evidence, that Zickefoose disobeyed the Order or that she did not take reasonable steps to comply with the Order. See Harris v. City of Philadelphia, 47 F.3d 1311, 1324 (3d Cir. 1995). Accordingly, this Court will deny Oleson's motion to find Warden Zickefoose in contempt. See Jones, 425 Fed. App'x at 96.

This Court will also deny the Warden's motion to vacate the Order. Federal law provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). See Jones v. Bock, 549 U.S. 199 (2007);

Woodford v. Ngo, 548 U.S. 81 (2006).  This exhaustion requirement
applies to federal prisoners seeking relief.  See Nyhius v. Reno,
204 F.3d 65, 69 (3d Cir. 2000).

The Warden of a facility has the responsibility to establish
procedures to implement the Administrative Remedy Program in her
facility.  See 28 C.F.R. § 542.11(a).  The first step of the
program is for the inmate to present an issue of concern
informally to staff, using the BP-8 form, prior to submission of
a Request for Administrative Remedy (BP-9) to the Warden.  See 28
C.F.R. § 542.13(a).  If the matter is not informally resolved,
the inmate must submit an Administrative Remedy Request "on the
appropriate form (BP-9) [within] 20 calendar days following the
date on which the basis for the Request occurred."  28 C.F.R.
542.14(a).  The regulations require the inmate to "obtain the
appropriate form from . . . institution staff (ordinarily, the
correctional counselor) [and to] complete the form with all
requested identifying information and . . . state the complaint
in the space provided on the form."  28 C.F.R. 542.14(c)(1) &
(3).  If an inmate wants to appeal the Warden's decision on his
Administrative Request, he must "submit an Appeal on the
appropriate form (BP-10) to the appropriate Regional Director
within 20 calendar days of the date the Warden signed the
response," and an inmate who is not satisfied with the Regional
Director's decision may appeal "on the appropriate form (BP-11)

to the General Counsel within 30 calendar days of the date the
Regional Director signed the response." 28 C.F.R. § 542.15(a).

In 2010, Oleson filed a motion for an "order requiring the
staff at F.C.I. Fort Dix to provide prisoners with administrative
remedy forms upon request." [Dkt. 10.] He averred that he has
been "continuously and systematically . . . denied Administrative
Remedy forms by the staff at F.C.I. Fort Dix." Id. Because this
Court was not able to locate the required forms (BP-8, BP-9, BP-
10, BP-11) on the BOP's website, this Court could not forward
blank forms to Oleson. Because other inmates at FCI Fort Dix
have raised the same issue (in this case and others), and because
the regulations place responsibility for implementation of the
program on the Warden, without making a finding, this Court
ordered Warden Zickefoose to do what the regulations required her
to do, i.e., "see to it that blank administrative remedy forms
(BP-9, BP-10, BP-11) are readily available to Plaintiff (and all
other inmates at FCI Fort Dix)." [Dkt. 28 at 1.]

In her motion, Zickefoose asks this Court to vacate the
Order "requiring the staff at FCI Fort Dix to provide prisoners
with administrative remedy forms upon request." [Dkt. 120.]
Relying on the declarations of Correctional Counselors Stanley
Silver and Horace Thompson, and Case Manager Konrad Adamiec,
Zickefoose maintains that this Court should vacate its Order,
since at the time of entry, "the Court did not have the benefit

37

of this evidence.  The declarations from members of Plaintiff's Unit Team clearly demonstrate that administrative remedy forms have always been available to Plaintiff.  Unless vacated, the Warden will continue to be subject to motions for contempt that have no factual basis whatsoever."  [Dkt. 130-1 at 10.]

To the contrary, the declaration of Mr. Silver shows that he does not give inmates the required forms upon request.  Silver states that an inmate cannot begin the administrative remedy process until the inmate gives him a completed "copout" and Silver returns his response to the "copout" to the inmate.[7] [Dkt. 130-2 at 3.]  Silver further states that he will not give a requested BP-8 informal resolution form to the inmate until Silver "attempt[s] verbal resolution of the inmate's grievance [and] verbal resolution fails."  Id.  Silver avers that he will not give an inmate either of the appeal forms (BP-10 and BP-11) unless the "inmate [] show[s] me the responses he received to his remedy from the prior level."  Id. at 4.  And while Silver avers that "Mr. Oleson can request administrative remedy forms from me or any member of the Unit Team at any time," Silver's declaration shows that he does not provide the forms in response to such requests.  Id.

---

[7] Unlike the forms required by the Administrative Remedy Programs, which can only be obtained from staff, the "copouts" are available in the library. [Dkt. 130-2 at 2-3.]

In light of Silver's troubling declaration, this Court is reluctant to vacate its order directing Zickefoose to oversee the proper functioning of the program.  This Court also fails to see how Zickefoose will continually be subject to contempt motions when Oleson is no longer housed at FCI Fort Dix.  This Court will accordingly deny the motion to vacate the Order, which merely directs the Warden to do what the regulations require her to do.

## IV.  CONCLUSION

The Court will dismiss the Complaint and deny the pending motions.


                                s/Noel L. Hillman
                                **NOEL L. HILLMAN, U.S.D.J.**

Dated:   December 21, 2012

At Camden, New Jersey